UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION


UNITED STATES OF AMERICA        :        CR-1-01-009-3
                                :
                                :
          v.                    :        **GOVERNMENT'S SENTENCING**
                                :        **MEMORANDUM ON REMAND**
                                :
ISADORE GENNINGS                :        Senior J. Spiegel

          - - - - - - - - - - - - - - - - - - - - - -


     This case is before the Court for resentencing on remand

from the Sixth Circuit Court of Appeals.  The Court of Appeals

found that the District Court failed to properly rule on the

issue of whether the defendant was entitled to the benefit of the

safety valve provisions of § 5C1.2 U.S.S.G.  For the following

reasons, the United States believes that the defendant is not

entitled to the benefit of the safety valve provision.

              **STATEMENT OF THE FACTS PROVED AT TRIAL**

                       **The Conspiracy**

     In February of 2000, Isadore Gennings, the defendant, moved

from Chicago, Illinois to Cincinnati, Ohio with his girlfriend

and co-defendant Nekia Barney.  Barney knew co-defendants

Anderson and Patterson from when she lived in Chicago.  Barney

knew Anderson and Patterson were drug dealers, but had had no

contact with them for years.  (Tr. Trial 11/13/01 Vol. I at 144-

148).

     Anderson telephoned Barney in September of 2000 to tell her

he was in Cincinnati.  Barney met Anderson at a bar and he

introduced her to co-defendants Addison and Lundy.  Anderson told

Barney that Addison and Lundy were selling drugs for him.  (Tr.

Trial 11/14/01 Vol. II at 6-8).  On one occasion, Anderson came

to Addison's apartment on Montgomery Road in Cincinnati.

Anderson brought defendant Gennings and another unknown male with

him.  Anderson had Addison retrieve a kilo of cocaine that

Addison was storing, and Anderson proceeded to open it and cook

it into crack.  Anderson waited for the crack to dry and

separated it into four separate packages.  He then gave one of

the packages, about ten ounces, to Gennings.  (Tr. Trial 11/14/01

Testimony of Robert Addison at 17-20).  Addison was aware of

three trips that Gennings made for Anderson.  About three weeks

prior to his arrest, Gennings had driven the same blue Camaro

with a hidden compartment in which he was later arrested to

Lundy's home where Addison, Lundy, and Gennings removed five to

six kilos and brought them into Lundy's residence.  (Tr. Trial

11/14/01 Testimony of Robert Addison at 33-35).

    A few weeks later, Anderson moved in with Barney and

Gennings.  In late September, Lashon Patterson drove to

Cincinnati to meet Anderson.  Patterson's role had been to pick

up cocaine from Anderson's suppliers in Chicago and give it to

whoever wanted it.  (Tr. Trial 11/14/01 Testimony of Lashon

Patterson at 68-77).  The meeting in late September 2000 took

place at Barney's and Gennings' apartment.  On that occasion,

Gennings asked Anderson to supply him with cocaine.  (Tr. Trial

11/14/01 Testimony of Lashon Patterson at 78-80).  Anderson

stayed for several weeks until one day Barney came home from work
to find Anderson counting a large amount of money on her kitchen
table.  She called Gennings and asked him to come home.  She told
Gennings what she had seen, that Anderson was a drug dealer, and
Gennings asked Anderson to leave.  Anderson continued to call
Barney from time to time.  Barney saw Anderson in November when
he came to visit.  Barney and Gennings were having financial
problems, and Gennings asked Barney if they could borrow
$5,000.00 from Anderson.  Anderson gave the money to Gennings.
Barney and Gennings were concerned that Anderson might expect
them to do something in return for lending them the money.  (Tr.
Trial 11/14/01 Vol. II at 10-16).

     In December 2000, Anderson asked Gennings to make a trip for
him to pick up some "mix".  Gennings met Patterson in a parking
lot in Indiana and returned immediately to Cincinnati.  (Tr.
Trial 11/14/01 Vol. II at 17-19).

     On the evening before January 29, 2001, Christopher Anderson
came to Gennings' and Barney's apartment.  Anderson had a white
laundry bag that contained a bank money counter and told Barney
that "maybe Addison can get my money right . . . ."  Shortly
thereafter Addison arrived, and Anderson and Addison went into
the kitchen.  Anderson called Gennings into the kitchen and spoke
to Anderson and Addison.  When Gennings came out, he asked Barney
to go on a trip.  Anderson told Barney he wanted her to go along
to watch his money.  (Tr. Trial 11/14/01 Vol. II at 20-24).

Between 11:00 p.m. and midnight, Addison and Lundy delivered a blue Camaro to Gennings, and Gennings and Barney drove to a Lee's Inn in Indiana and checked into a motel.  Gennings called Lashon Patterson and Christopher Anderson.  Lashon Patterson met Gennings in the lobby of the motel, and Gennings gave Patterson the keys to the Camaro (Tr. Trial 11/14/01 Vol. II at 25-29; Tr. Trial 11/14/01 Testimony of Lashon Patterson at 81-83).  Patterson took the car, helped the supplier (Tony) remove the money from the secret compartment, and replace it with the cocaine.  Patterson then drove the Camaro back to the Lee's Inn, called Gennings, and told him the car was ready.  (Tr. Trial 11/14/01 Testimony of Lashon Patterson at 82-84).  Gennings and Barney immediately checked out, around 4:00 a.m., and began the drive back to Cincinnati.

### The Traffic Stop

On January 29, 2001, at approximately 8:00 a.m., Sergeant Greg Morgan of the Regional Narcotics Unit (RENU) was working traffic enforcement in the area of Interstate 74 near Interstate 275 in Cincinnati.  Sergeant Morgan was traveling eastbound on Interstate 74 from the Indiana state line when he observed a blue Chevrolet Camaro.  The officer's laser radar unit clocked the Camaro at 71 m.p.h. in a 65 m.p.h. zone.  Sergeant Morgan observed the Camaro abruptly change lanes without signaling, causing a large truck to aggressively brake.  (Tr. Suppression Hearing 10/30/01 at 5-7).  The police computer revealed that although the vehicle had Illinois plates, it was not registered

4

with the Illinois BMV.  The officer effected a traffic stop on

the vehicle, approached the operator (Isadore Gennings), and

requested the vehicle registration, proof of insurance, and his

operator's license.  Gennings presented Sergeant Morgan with an

expired Illinois State identification card.  Gennings had no

driver's license, no vehicle registration, and no insurance card.

(Tr. Suppression Hearing 10/30/01 at 8-9).

The officer advised Gennings that the reason he was stopped

was for speeding and a lane violation.  Sergeant Morgan returned

to his cruiser and conducted computer queries on the driver and

the vehicle.  The officer received information from the Illinois

BMV that Gennings' driving privileges were suspended.  Further

checks on the vehicle confirmed that it was unregistered.  (Tr.

Suppression Hearing 10/30/01 at 8-9).

Sergeant Morgan returned to the Camaro and asked Gennings to

exit the vehicle in order to speak to him further.  He asked

Gennings where he was coming from, and Gennings told him that his

girlfriend, Nekia Barney, had been visiting Chicago the previous

evening and had car trouble.  Gennings said that he borrowed the

car from his friend "Opie" in Cincinnati and drove to Chicago to

change a tire for Barney.  Gennings told the officer that he and

Barney rented a room in Lafayette, Indiana where they decided to

leave Barney's vehicle because he felt it would be dangerous to

drive her car with the donut spare due to the weather.  (Tr.

Suppression Hearing 10/30/01 at 9-11).

Sergeant Morgan attempted to have Gennings identify the owner of the vehicle, but Gennings was unable to provide any telephone numbers or addresses for the owner. The officer returned to the Camaro and asked Barney if she had a driver's license. Barney displayed a valid Illinois operator's permit. Barney told Sergeant Morgan that she was driving from Chicago to Cincinnati when she had an accident. She said the car had extensive damage and had to be towed. Barney told the officer that the blue Camaro was owned by her friend, Gwendolyn. (Tr. Suppression Hearing 10/30/01 at 13-14).

Sergeant Morgan then returned to his patrol vehicle and asked Gennings if he had any drugs, weapons, or large amounts of currency in the Camaro. Gennings said, "if you find any drugs in the car, I'd kill the person who let me drive the car." The officer asked Gennings for permission to search the vehicle, and Gennings gave consent. Sergeant Morgan had Barney exit the Camaro. At that time, Agent Bernard Erwin arrived with his narcotic dog, "Boomer", a certified canine. (Tr. Suppression Hearing 10/30/01 at 55-56). Agent Erwin had "Boomer" sniff the exterior of the car, and "Boomer" alerted to the odor of a narcotic around the trunk area. The hatchback was opened and "Boomer" alerted near a large after market speaker box. (Tr. Suppression Hearing 10/30/01 at 58, 59).

Agents then had Barney drive the vehicle to the Hamilton County Patrol Headquarters a few miles away. Once there, Agents made a more thorough search of the vehicle and found ten

kilograms of cocaine in a hidden area connected to the speaker
box, which was controlled by two concealed hydraulic shocks.
(Tr. Suppression Hearing 10/30/01 at 17-20).

After his arrest, Gennings was read his <u>Miranda</u> rights and
made a statement to the police.  Gennings essentially told them
that he was working for Shawn (Patterson) and Reece (Addison) by
transporting money for them on two occasions prior to his arrest.
He never mentioned Christopher Anderson.  (Tr. Trial 11/14/01
Vol. II at 70-78).  Gennings told the police that the Camaro was
to be returned to Addison and made several recorded telephone
calls to him.  Ultimately, Addison and Lundy responded to pick up
the car and were arrested.  The police did not find out about
Christopher Anderson (the leader of this Cincinnati group) until
after the arrest of Addison and Lundy some seven and a half hours
after Gennings was arrested.  By the time the police located
Anderson's residence and obtained a search warrant, Anderson had
fled.  (Tr. Trial 11/14/01 Vol. II at 79-106).

The safety valve provision makes it the court's
responsibility to determine whether the defendant meets the five
criteria set out in 18 U.S.C. § 3553(f).  If the defendant meets
the five criteria, the court is then required to sentence the
defendant according to the guidelines without regard to any
mandatory minimum under 21 U.S.C. § 841.

A defendant bears the burden of proving that he is entitled
to the safety valve benefits, and he must take affirmative steps
to disclose all the information that he possesses.  <u>United States</u>

v. Adu, 82 F.3d 119 (6th Cir. 1996).  The defendant must produce

specific evidence to support his claim.  Where the government

challenges a defendant's claim of complete and timely disclosure,

and the defendant does not produce evidence that demonstrates

such disclosure, a district court's denial of a motion under §

3553(f) and § 5C1.2(5) is not clearly erroneous.  Adu, supra,

citing United States v. DeJesus-Gaul, 73 F.3d 395, 397 (D.C. Cir.

1996).

The government agreed at the initial sentence that the

defendant satisfied the first four criteria, but asserted that he

failed to satisfy the fifth criteria of 18 U.S.C. § 3553(f):

> (5)  not later than the time of the sentencing hearing,
> the defendant has truthfully provided to the Government
> all information and evidence the defendant has
> concerning the offense or offenses that were part of
> the same course of conduct or of a common scheme or
> plan, but the fact that the defendant has no relevant
> or useful other information to provide or that the
> Government is already aware of the information shall
> not preclude a determination by the court that the
> defendant has complied with this requirement.

The defendant's failure to satisfy the fifth criteria is

apparent in the facts presented above and is further evidenced in

the written statement submitted by the defendant which is

appended to the presentence report. In that statement he denied

all knowledge of the offense.  The defendant stated that he took

the vehicle to meet Patterson in Indiana so that Patterson could

test drive the vehicle at 4:00 a.m. in the morning.  (Presentence

Report, Statement of Defendant).

In a discussion at sentencing, counsel for the government

stated:

MR. BRICHLER:  No, Your Honor.  The only thing I would like to do is I would like to specifically put on the record the fact that the United States does not believe that Mr. Gennings would be eligible for the safety valve under 5C1.2.

THE COURT:  At this time?

MR. BRICHLER:  At this time or any time.  It's our position that, since the time of his arrest, he misled the police officers.  What statements he did make were incomplete.  They later turned out to be untruthful. He later recanted the statements under oath.  It's our opinion he's testified under oath and perjured himself. Therefore, specifically, we want to make clear that, as far as the government is concerned, he has not provided that information necessary to be eligible for that provision.

(Tr. Sentencing 03/14/02 at 16-17).

The defendant presented no evidence at the sentencing hearing.

The United States submits that the record in this case is such that the defendant could not qualify for the safety valve provision.  Therefore, the United States requests this Court to rule, by the preponderance of the evidence standard, that the defendant does not qualify for the safety valve and reinstate the sentence of 240 months.

                                        Respectfully submitted,

                                        GREGORY G. LOCKHART
                                        United States Attorney


                                        s/Robert C. Brichler
                                        ROBERT C. BRICHLER (0017745)
                                        Assistant United States Attorney
                                        221 East Fourth Street, Suite 400
                                        Cincinnati, Ohio  45202
                                        (513) 684-3711
                                        Fax:  (513) 684-2047
                                        Robert.Brichler@usdoj.gov

CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing "Government's Sentencing Memorandum On Remand" was served this 8th day of November, 2004, electronically on C. Ransom Hudson, Attorney for Defendant Gennings.

s/Robert C. Brichler
ROBERT C. BRICHLER (0017745)
Assistant United States Attorney

C:\Documents and Settings\aoleary\Local Settings\Temporary Internet Files\OLK273\gennings.remand.wpd